**In re OAKWOOD HOMES CORPORATION, et al., Debtors.**

**OHC Liquidation Trust, Plaintiff,**

**v.**

**Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (USA), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100, Defendants.**

**Bankruptcy No. 02–13396 (PJW).
Adversary No. 04–57060 (PJW).**

United States Bankruptcy Court, D. Delaware.

Nov. 15, 2007.

Mark D. Collins, Russell C. Silberglied, Lee E. Kaufman, Christopher M. Samis, Richards, Layton & Finger, P.A., Wilmington, DE, R. Paul Wickes, Mary K. Warren, Michael J. Osnato, Jr., J. Justin Williamson, Linklaters, New York, NY, for Defendants.

Marla Rosoff Eskin, Kathleen Campbell Davis, Campbell & Levine, LLC, Wilmington, DE, Tony Castanares, Stephan M. Ray, Scott H. Yun, Whitman L. Holt, Stutman, Treister & Glatt P.C., Los Angeles, CA, for the OHC Liquidation Trust.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

This opinion is regarding the motion of OHC Liquidation Trust ("Plaintiff" or

"Trust") for determination of Plaintiff's right to a jury trial (Doc. # 198) in this adversary proceeding. Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC,(f/k/a Credit Suisse First Boston LLC), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.) (collectively, "Defendants") oppose the motion. For the reasons stated below, the Court will grant the motion.

## Background

Oakwood Homes Corporation ("OHC") together with its subsidiaries and affiliates ("Debtors" or "Oakwood Companies") designed and manufactured various models of homes at a modest or affordable price. (Doc. # 202, Decl.Murphy, Ex. A, ¶ 12). As part of their business, Oakwood Companies also provided their customers with mortgage financing or retail installment sales contracts (collectively "installment contracts"). Oakwood Companies obtained the necessary funds for the installment contracts through a two-step, asset-backed securitization process. (Doc. # 202, Decl.Murphy, Ex. A, ¶ 14). Defendants were the underwriter for this process. (Doc. # 202, Decl.Murphy, Ex. A, ¶ 14). The asset-backed securitization process was commenced by Oakwood Companies using the installment contracts as collateral to borrow against the warehouse facility ("Warehouse Facility")[1]. Warehouse Facility was a short-term facility used specifically to fund the mortgages for manufactured home buyers. (Doc. # 202, Decl.Murphy, Ex. A, ¶ 17.b). Once the Warehouse Facility had accumulated a sufficient amount of installment contracts, usually about $150 million to $200 million, the installment contracts were bundled and sold to private and institutional investors through a real estate mortgage investment trust. (Doc. # 202, Decl.Murphy, Ex. A, ¶ 14).

The Warehouse Facility was one of three lines of credit Oakwood Companies used to finance their operations; they also had a revolving line of credit and a servicer advance facility. (Doc. # 202, Decl.Murphy, Ex. A, ¶ 17.a-c). The Warehouse Facility was provided by an affiliate of Bank of America until 2001. (Doc. # 202, Decl.Murphy, Ex. A, ¶ 17.b).

Starting in 1999 the manufactured home industry was going through a difficult period, and Oakwood Companies' businesses were struggling. By the second half of 2000, Bank of America wanted to cease its role as the warehouse lender. (Doc. # 202, Decl.Murphy, Ex. A, ¶ 26). This was a critical junction for Oakwood Companies, if they did not have the Warehouse Facility, their securitization business would have collapsed. (Doc. # 202, Decl.Murphy, Ex. A, ¶ 26). Eventually after some negotiations, Defendants agreed to assume the role of lender and agent on the Warehouse Facility. On February 9, 2001, Oakwood Companies and Defendants signed various documents to finalize Defendants' new role. (Doc. # 202, Decl.Murphy, Ex. A, ¶ 26). The main document was a Class A Note Purchase Agreement ("Note Purchase Agreement").

The business continued to slump. On November 15, 2002, Oakwood Companies filed petition for bankruptcy protection under chapter 11 of title 11 of the United State Code, 11 U.S.C. §§ 101 *et seq.* (Doc. # 202, Decl.Murphy, Ex. A, ¶ 37). Defendants filed four proofs of claim, seeking payments of fees and expenses stemming from an August 19, 2002 letter agreement ("Engagement Letter"). Pursuant to the Engagement Letter, Oakwood Companies employed Defendants as the exclusive fi-

---

1. Defendants refer to the Warehouse Facility as the Loan Purchase Facility.

nancial advisor for the contemplated restructuring transaction. (Doc. # 202, Decl.Murphy, Ex. B, ¶ 3).

On November 13, 2004, Plaintiff commenced the adversary proceeding by filing an Objection to the Proof of Claim and Counterclaims. The objections and counterclaims are: (1) breach of fiduciary duty; (2) negligence; (3) unjust enrichment; (4) equitable subordination; (5) avoidance and recovery of 90 day preferential transfers pursuant to 11 U.S.C. §§ 547, 550; (6) avoidance and recovery of one year preferential transfer pursuant to 11 U.S.C. §§ 547, 550; (7) avoidance and recovery of fraudulent transfers pursuant to 11 U.S.C. §§ 544, 550, and applicable state law; (9) breach of implied and express contract; and (10)deepening insolvency. (Doc. # 201, pp. 2–3). The alleged facts giving rise to this extensive list occurred both prior to and after the Engagement Letter. (Doc. # 198, p. 2).

Plaintiff is prepared to litigate various causes of action arising from two sets of distinct nucleus of operative facts. The first set of facts is centered around the parties' relationship pre-Engagement Letter. According to Plaintiff: (1) Prior to the Engagement Letter, Oakwood Companies and Defendants "enjoyed a close and intimate relationship," (Doc. # 198, p. 2), which presumably is because of Defendants' role as the underwriter and then a secured lender to Oakwood Companies. (Doc. # 202, Decl.Murphy, Ex. A, ¶ 11).(2) Plaintiff alleged that the trust and confidence between the parties created both a fiduciary duty and an implied advisory contract. (Doc. # 198, p. 2).(3) Defendants, however, did not exercise reasonable care in carrying out their obligations. (Doc. # 198, p. 3).

For Defendants' alleged failures, Plaintiff claims that they earned massive fees and caused substantial economic damage to the Oakwood Companies. (Doc. # 198, p. 3). For Defendants' alleged breach of fiduciary duty, negligence, and breach of implied contract claims, Plaintiff is requesting recovery of all fees and other remuneration paid to Defendants, *and* actual and consequential damages. (*See* Doc. # 201, pp. 4–5).

The second set of facts is based on the performance under the Engagement Letter. Plaintiff accuses Defendants of not fulfilling their obligations under the Engagement Letter; therefore their claim should be disallowed. Plaintiff wants to be awarded additional damages, and recovery under 11 U.S.C. §§ 547 & 548. (Doc. # 198, p. 3).

Plaintiff's complaint asserts a right to a jury trial. Plaintiff has moved to have a jury trial for the causes of action related to the first set of operative facts. (Doc. # 198, pp. 3–4). The causes of action related to the second set of facts are not covered by the motion because they relate to the allowance of Defendants' claims. (Doc. # 198, pp. 3–4).

### Discussion

■ Generally, "the bankruptcy court is an appropriate tribunal for determining whether there is a right to a trial by jury of issues for which a jury trial is demanded." *Official Comm. Of Unsecured Creditors v. TSG Equity Fund L.P. (In re Envisionet Computer Servs.),* 276 B.R. 1, 6–7 (D.Me.2002); *In re Wash. Mfg. Co.,* 128 B.R. 198, 200–01 (Bankr.M.D.Tenn.1991).

Defendants put forth a number of grounds contesting Plaintiff's motion. First, the types of claims and forms of relief Plaintiff is raising are equitable rights, thus there is no right to a jury trial attached. Second, even if Plaintiff has the right to jury trial it is unenforceable because the claims are part of the "claims-allowance process." Third, in connection

with the Note Purchase Agreement, several of the Oakwood Companies executed contracts in which they waived the right to a jury trial. Finally, Defendants argue that because Plaintiff brought these actions in a court of equity, Plaintiff has forfeited its right to a jury trial.

*Right To a Jury Trial*

■ The right to a jury trial in a civil case is preserved in the Seventh Amendment of the U.S. Constitution. It states: "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved...." *U.S. Const. amend. VII.* As for the meaning of "suits at common law," the Supreme Court has interpreted it to mean " 'suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered.' " *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 40–41, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989) (quoting *Parsons v. Bedford,* 3 Pet. 433, 447, 7 L.Ed. 732 (1830)). In other words, a right to a jury trial attaches to those cases involving legal right and not those involving only equitable claims and remedies. *Billing v. Ravin, Greenberg & Zackin, P.A.,* 22 F.3d 1242, 1245 (3d Cir.1994).

■ The Supreme Court in *Granfinanciera* provided the analytical framework to determine whether there is a right to a jury trial:

First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature. The second stage of this analysis is more important than the first. If, on balance, these two factors indicate that a party is entitled to a jury trial under the Seventh Amendment, we

must decide whether Congress may assign and has assigned resolution of the relevant claim to a non-Article III adjudicative body that does not use a jury as fact finder.

*Granfinanciera,* 492 U.S. at 43, 109 S.Ct. 2782. The determination is a matter of federal law. *Simler v. Conner,* 372 U.S. 221, 222, 83 S.Ct. 609, 9 L.Ed.2d 691 (1963); *Byrd v. Blue Ridge Rural Elec. Coop.,* 356 U.S. 525, 537–39, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958). When a court is deciding if there is a right to a jury trial, it must remember that because "the right to jury trial is a constitutional one, ... while no similar requirement protects trials by the court, [the court's] discretion is very narrowly limited and must, wherever possible, be exercised to preserve jury trial." *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 510, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); *Turner v. Johnson & Johnson,* 809 F.2d 90, 99 (1st Cir.1986)("[I]f we must err, we choose to do so on the side of preserving plaintiffs' right to a jury trial."); *Prudential Oil Corp. v. Phillips Petrol. Co.,* 392 F.Supp. 1018, 1022 (S.D.N.Y. 1975)("[T]he inescapable teaching of recent Supreme Court decisions is that there is a clear federal policy in light of the Seventh Amendment favoring jury trials and that, in doubtful cases, that policy should be favored.").

*First Stage: Legal or Equitable Claims*

■ For the first stage of the *Granfinanciera* analysis, this Court must determine whether Plaintiff's claims of negligence, breach of implied contract, and breach of fiduciary duty would have been considered legal or equitable claims in 18th century English courts. Plaintiff characterizes the negligence and breach of implied contract claims as historically legal actions, while the breach of fiduciary claim as an equitable claim. (Doc. # 198, p. 10)

Defendants do not challenge the characterization in their brief. (Doc. # 201, pp. 7–8). They do, however, contest that because the negligence and breach of implied contract claims arose from the same nucleus of operative facts as the breach of fiduciary duty claim they are not separate and independent causes of action. (Doc. # 202, p. 11–12). Rather, they are just breach of fiduciary duty claim in different names, hence, are equitable claims.

I disagree. The notion that a single act of malfeasance can violate several distinct equitable and legal duties is a fundamental principle of Anglo–American jurisprudence. *See Germain v. Conn. Nat'l Bank*, 988 F.2d 1323, 1329 (2nd Cir.1993) (stating that both legal and equitable claims can arise from the same fact). For example, it is possible that a jury could conclude that although the parties enjoyed a close relationship, it was not enough to create a fiduciary duty. Such a finding would not preclude a finding of negligence or of breach of contract with respect to an implied advisory contract. Likewise, Defendants always owed Oakwood Companies a duty of reasonable care in rendering their services, the breach of which could give rise to damages even in the absence of any fiduciary relationship. *See, e.g., Balaber–Strauss v. N.Y. Tel. (In re Coin Phones, Inc.)*, 203 B.R. 184, 200–01 (Bankr. S.D.N.Y.1996). Thus, the claims are each separate and independent, and must be characterized individually.

■ Plaintiff's characterization of each claim is accurate. It has been well settled that tort claims, such as negligence, are legal actions. *See City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 710, 119 S.Ct. 1624, 143 L.Ed.2d 882 (stating that the Seventh Amendment covers all actions that "sound basically in tort"); *Arkwright Mut. Ins. Co. v. Phila. Elec. Co.*, 427 F.2d 1273, 1275 (3d Cir.1970)(stating in common

law a jury is required for negligence cases); 8–38 MOORE'S FED. PRACTICE § 38.30. This is applicable to persons as well as to corporate parties. *See, e.g., Ross v. Bernhard*, 396 U.S. 531, 542, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970)(explaining how a corporation "would have been entitled to a jury's determination, at a minimum, ... of its rights against its own directors because of their negligence").

■ Claims for breach of contract, expressed or implied, are also legal rights under the common law. *Donovan v. Robbins*, 579 F.Supp. 817, 822 (N.D.Ill.1984) (claims seeking "money damages for breach of express or implied contracts ... are clearly legal and [ ] the Seventh Amendment would require a jury trial as to them"); 8–38 MOORE'S FED. PRACTICE § 38.30 ("Actions for money damages for breach of contract are legal in nature and are triable to a jury.").

■ Claims for breach of fiduciary duty, however, are historically equitable rights. *Pereira v. Farace*, 413 F.3d 330, 338 (2d Cir.2005), *cert denied*, —— U.S. ——, 126 S.Ct. 2286, 164 L.Ed.2d 812 (2006); *In re Hutchinson*, 5 F.3d 750, 757 (4th Cir.1993). The best evidence in support, as Defendants point out in their brief, is that the Delaware Chancery Court still has exclusive jurisdiction to hear breach of fiduciary duty cases. *Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163 (Del. Ch.2002).

■ With two legal rights and one equitable right Plaintiff has a mixture of claims. In such situation "a party will not be denied a jury trial just because other claims arising out of the same facts are equitable." *Germain*, 988 F.2d at 1329. The "right to jury trial on the legal claims ... must not be infringed either by trying the legal issues as incidental to the equitable ones or by a court trial of a common

issue existing between the claims." *Ross,* 396 U.S. at 538, 90 S.Ct. 733. Meaning, "the Seventh Amendment requires that all factual issues common to these claims be submitted to a jury for decision on the legal claims before final court determination of the equitable claims." *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 422–23 (5th Cir.1998); *Mirant Corp. v. Southern Co.,* 337 B.R. 107, 120 (N.D.Tex.2006)("[J]oinder of equitable claims with legal claims does not deprive a party of the right to a jury trial on the legal claim."). Consequently, even though Plaintiff asserts an equitable right, under the first prong of the *Granfinanciera* analysis it still retains its right to a jury trial as to the two legal rights.

*Second Stage: Legal or Equitable Relief*

The second stage of the *Granfinanciera* analysis requires this Court to characterize the type of remedy sought. This stage is more important than the first stage. *Granfinanciera,* 492 U.S. at 42, 109 S.Ct. 2782. Plaintiff argues that the relief it seeks is a legal remedy because it is for compensatory money damages. (Doc. # 198, pp. 11–12). Even though Plaintiff has a mix of legal and equitable claims, he argues that when the relief for the breach of fiduciary duty claim is a legal remedy, the "action assumes legal attributes." *Mirant,* 337 B.R. at 120.

Plaintiff cites the Second Circuit Court of Appeals's *Pereira* case in support. In *Pereira,* the bankruptcy trustee of Trace International Holding, Inc. ("Trace") sued several former officers and directors of Trace for breach of fiduciary duty under Delaware state law. 413 F.3d at 335–37. The trustee asserted various claims for monetary damages, including for amounts improperly transferred by Trace under the Defendants' watch. *Id.* at 336. The defendants maintained "that they were enti-

tled to a jury trial on the [t]rustee's beach of fiduciary duty claim because the nature of the underlying action was legal and the remedy sought was compensatory damages, not equitable restitution." *Id.* at 337. The district court rejected this argument. It classified the remedy as restitution, thus, equitable, and the defendants were not entitled to a jury trial. *See id.* at 339. The Second Circuit reversed the district court's holding. Applying the *Granfinanciera* test, the court concluded that for the first stage the breach of fiduciary duty claim "would have been equitable in 18th century England." *Id.* at 339. For the second stage, the Second Circuit looked to *Great–West Life & Annuity Insurance Company v. Knudson,* 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), for guidance. In *Great–West,* the Supreme Court stated that " 'for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession.' " *Pereira,* 413 F.3d at 340 (quoting *Great–West,* 534 U.S. at 214, 122 S.Ct. 708). Because the trustee's claim was for compensatory damages, rather than any particular property in the Defendants' possession, the second prong of the *Granfinanciera* test rendered his suit legal in nature and required a jury trial. *Id.* at 341.

Here, Defendants contend that the relief sought is a mix of legal and equitable remedies, thus Plaintiff is not entitled to a jury trial. (Doc. # 202, pp. 8–11). Defendants try to distinguish the *Pereira* case from the present case on account that the defendants in *Pereira* were not personally enriched from the breach of fiduciary duty, therefore, the relief was for damage. Whereas, in the present case Defendants enriched themselves and Plaintiff is seeking "classically equitable remedies, includ-

ing disgorgement and equitable subordination." (Doc. # 201, p. 9).

For support, Defendants offer *Cantor v. Perelman*, No. Civ.A.97–586–KAJ, 2006 WL 318666 (D.Del.Feb.6, 2006). In *Cantor*, the trustee sued the directors of a corporation for breach of fiduciary duty and aiding and abetting in the breach. *Id.* at *2. The trustee sought to recover "compensatory damages, including all benefits obtained by defendants as a result of their breaches of fiduciary duty or participation in breaches of fiduciary duty." *Id.* The court applied the *Granfinanciera* test. The first prong weighed against right to a jury trial because both of the Plaintiff's claims were historically equitable. *Id.* at *7. The second prong resulted in a mix of equitable and legal remedy. *Id.* at *9. The court concluded, after commenting on the *Pereira* decision, that "compensatory damages" was legal in nature, while "benefits obtained by defendants" was an equitable remedy. *Id.* at *8–9. In its final balancing the court held that where the claims were equitable and the relief sought were both legal and equitable, it weighed against right to jury trial.

The *Cantor* case is not the proper comparison for the present case. First, in *Cantor* there were only two historically equitable claims at issue; breach of fiduciary duty and aiding and abetting the same. The court noted that its analysis would have been impacted "if at least one of Plaintiff's claims [had been] legal rather than equitable." *Id.* at *7 n. 7. That is the case here. Plaintiff has two causes of action that have always been legal in nature and one that is historically equitable. Second, the trustee in *Cantor* was clearly focused on recovering specific sums received by the directors in connection with certain transactions, *see id.* at *1, which made the remedy equitable. *See id.* at *9. Here, in contrast, the thrust of Plaintiff's

case is on remedying the alleged harm incurred by the Debtors, rather than on merely recovering illicit gains. Thus, *Cantor* is distinguishable from the present case.

The more appropriate case for this Court to look to is *Pereira*. Plaintiff is seeking to recover fees and other remuneration paid to Defendants, *and* actual and consequential damages. This relief is very similar to the relief the trustee in *Pereira* sought; for monetary damage and improperly transferred fees. The Second Circuit held that to be legal relief. Applying the *Great–West* test, the relief that Plaintiff is seeking is to impose personal liability on Defendants for the damage they have caused, it is not to recover any particular fund that Defendants have in their possession. Thus, the relief Plaintiff seeks is compensatory monetary damages, which is "the classic form of legal relief." *Great–West*, 534 U.S. at 210, 122 S.Ct. 708 (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993)); *see also, e.g., Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962) ("[W]e think it plain that [a] claim for a money judgment is a claim wholly legal in its nature however the complaint is construed."); *Billing*, 22 F.3d at 1245.

Ultimately, this Court must weigh the claims against the relief sought, with more weight on the latter, and determine if Plaintiff has right to a jury trial. Plaintiff in this case has presented two legal and one equitable claim and is seeking legal relief. Thus, the weighing clearly favors Plaintiff having the right to a jury trial. In sum, after balancing the two prongs of the *Granfinanciera* analysis, this Court holds that Plaintiff has the right to a jury trial.

*Third Stage: Claim-allowance Process or Not*

██ The third step in the *Granfinanciera* analysis is to determine whether this is a matter that Congress has assigned to a non-Article III court for adjudication without a jury. The Third Circuit has extrapolated from this prong an embedded limitation on the Seventh Amendment right. *Billing,* 22 F.3d at 1247. The limitation arises when a cause of action "falls within the process of the allowance and disallowance of claims." *Id.* at 1253. There, neither the debtor's estate nor the defendant has a Seventh Amendment right to trial by jury "because [the] claim has been converted from a legal one into an equitable dispute over a share of the estate." *Id.; Germain,* 988 F.2d at 1330 ("For waiver to occur, the dispute must be part of the claims-allowance process.... Even there the right to a jury trial is lost not so much because it is waived, but because the legal dispute has been transformed into an equitable issue."). This limitation originated from *Katchen v. Landy,* 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966). The Supreme Court in *Katchen* noted that part of Congress's intent for the Bankruptcy Act of 1898 was to place the resolution of disputed claims in summary proceeding in the bankruptcy court rather than proceeding at law. *Id.* at 329, 86 S.Ct. 467; *see Billing,* 22 F.3d at 1247. It was intended to promote expediency and judicial efficiency. *See Katchen,* 382 U.S. at 328, 86 S.Ct. 467.

Plaintiff asserts that the subject counterclaims are not part of the claim-allowance process and offers two reasons in support. First, the causes of action are unrelated to the Engagement Letter and are not products of the Bankruptcy Code. Instead, they are state law claims that could have been asserted by Oakwood Companies against Defendants prior to the Engagement Letter. (Doc. # 198, p. 18). Second, the success or failure of Plaintiff's counterclaims would not affect the allowance or disallowance of Defendants' claims under 11 U.S.C. § 502(d). (Doc. # 198, p. 18). If Plaintiff succeeds or fails on its non-bankruptcy legal claims, only the size of the Debtors' estate would be affected.

Defendants hold the opposing view. They contend that Plaintiff's counterclaims are in response to Defendants' proofs of claim, and the relief Plaintiff seeks is a resolution of Defendants claims. (Doc. # 201, p. 18). They also argue that when Plaintiff requested the Court to disallow or otherwise equitably subordinate Defendants' proofs of claim it has invoked and submitted to the equitable jurisdiction of this Court. (Doc. # 201, p. 15). According to Defendants, the fact that Plaintiff seeks affirmative recovery on his counterclaims and could have brought his counterclaims in other forum does not affect their conclusion. (Doc. # 201 pp. 15, 18).

██ Claim-allowance process means that "the resolution of the dispute in which a jury trial is sought must affect the allowance of the creditors's claim in order to be part of that process." *Germain,* 988 F.2d at 1327. An action that "would augment the estate but which have no effect on the allowance of a creditor's claim simply cannot be part of the claims-allowance process." *Id.* The action is only augmenting the estate "if [the trustee] wins, the estate is enlarged, and this may affect the amount ... creditors ultimately recover on their claims, but it has no effect whatever on the allowance of the [defendant's] claim." *Id.* Generally, lender liability actions augment the estate. *Id.*

The Court is persuaded that the subject counterclaims are not part of the claim-allowance process. As Plaintiff carefully points out in its motion, the claims that Defendants assert arise from the Engage-

ment Letter, whereas the subject counterclaims that Plaintiff asserts originate from the period prior to the Engagement Letter. The subject counterclaims are based on the financial institutions' alleged misconduct, separate from Defendants' proofs of claim for services performed pursuant to the Engagement Letter. Furthermore, Plaintiff's subject counterclaims only augment the estate. Plaintiff may raise the counterclaims in a separate trial, under applicable state law, and succeed on some or all of the counterclaims, yet it would not affect the allowance of Defendants' claims. The only effect that will result is that if it wins, the estate will be augmented by the compensatory monetary damage from Defendants. Thus, Plaintiff's counterclaims are not part of the claim-allowance process, and do not limit its right to a jury trial.

*Legal Claims in a Court of Equity*

█ As for Defendants' argument that Plaintiff submitted itself to the equitable jurisdiction of this Court by raising these counterclaims, the Court does not agree. Defendants argue that the Trust's choice to combine claim objections with affirmative litigation before this Court somehow makes the entire adversary proceeding part of the claims-allowance process or otherwise triggered a categorical submission to the equitable jurisdiction of this Court.

Circuits are split on Defendants' core proposal—that any adversary proceeding filed by the representative of a debtor's estate in a bankruptcy court, rather than in some alternative forum, categorically eliminates any and all of the estate's jury trial rights forever. *See Germain,* 988 F.2d at 1330 ("We conclude that neither precedent nor logic supports the proposition that either the creditor or the debtor automatically waives all right to a jury trial whenever a proof of claim is filed.");

*In re Jensen,* 946 F.2d 369, 373–74 (5th Cir.1991) (debtor's petition in the bankruptcy court does not affect its right to a jury trial). *But see N.I.S Corp. v. Hallahan (In re Hallahan),* 936 F.2d 1496, 1505 (7th Cir.1991) (holding debtor consented to jurisdiction by filing bankruptcy petition and thereby waived right to jury trial); *Bayless v. Crabtree Through Adams,* 108 B.R. 299, 305 (W.D.Okla.1989), *aff'd,* 930 F.2d 32 (10th Cir.1991) (holding legal assertions, otherwise subject to jury trial, brought by trustee or debtor are "open to adjudication in equity by Bankruptcy Judges under their power to afford complete relief").

The Third Circuit has not adopted Defendant's position.

The fact that the debtor may have voluntarily submitted itself to the bankruptcy court's equitable jurisdiction does not complete the analysis. A court must also ask whether the resolution of the particular dispute at issue is necessarily part of the process of the disallowance and allowance of claims. *See Katchen,* 382 U.S. at 336, 86 S.Ct. at 476.

*Billing,* 22 F.3d at 1252, n. 14. This Court believes that Defendants' core proposal flies in the face of the Supreme Court's clear instruction that "legal claims are not magically converted into equitable issues by their presentation to a court of equity." *Ross,* 396 U.S. at 538, 90 S.Ct. 733. Thus, the Court rejects Defendants' position.

*Contractual Waiver of Jury Trial*

The last ground that Defendants raise in opposition is that Plaintiff contractually waived its right to a jury trial. In connection with the Note Purchase Agreement, on February 9, 2001, two Oakwood Companies (OHC and Oakwood Acceptance Corporation, LLC) executed agreements with a Credit Suisse entity. Those agreements

contain a jury trial waiver whereby each party

HEREBY IRREVOCABLY AND UN-CONDITIONALLY WAIVES, TO THE EXTENT PERMITTED BY APPLI-CABLE LAW, ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN ANY LEGAL ACTION OR PRECEDING RELATING DIRECTLY OR INDI-RECTLY TO THIS AGREEMENT OR ANY OTHER DOCUMENT OR IN-STRUMENT RELATED HERETO AND FOR ANY COUNTERCLAIM THEREIN.

(Doc. # 202, Decl.Murphy, Ex. E, p. 6). According to Defendants, Plaintiff, in charge of liquidating the Debtors' estates, is the successor in interest to these two Oakwood Companies, and is prohibited by the waiver from seeking a jury trial on any claims "related directly or indirectly to the Note Purchase Agreement or any of the contracts related thereto under the loan purchase facility." (Doc. # 201, p. 22).

■■■ There are several reasons why this contractual waiver does not apply here. The first is the identity of the contracting parties. The purported waiver only involves two of the Debtors. The Trust succeeded to the rights of fifteen Debtor entities[2] pursuant to a plan of reorganization that effected a substantive consolidation of all the Debtors. The Credit Suisse entity that is a party to the two agreements bears the name of "Credit Suisse First Boston, New York Branch," as agent for the warehouse facility. (Doc. # 202, Decl. Murphy, Ex. "D" at signature page, Ex. "E" at signature page.) None of Defendants here bear that name.

In their answer to the complaint (Doc. # 132), Defendants very carefully note their separateness. Footnote 1 on p. 2 of the answer states:

The Defendants' use of "Defendants" to refer to the named Credit Suisse affiliated defendants is used for convenience only and is not an admission that any one of the Defendants is not a distinct and separate entity, or that any one of the Defendants is responsible for the liabilities of any other Defendant. Nor is any reference to "Defendants" an admission that any Defendant named or referenced in the Complaint participated in any of the acts alleged in the complaint, except as specifically admitted herein.

In their response to the motion, Defendants specifically identify "Credit Suisse Securities (USA), LLC" as the target of the jury trial counts: "The remaining claims—on which the Trust now seeks a jury trial—are claims arising out of the relationship between Oakwood and [Credit Suisse Securities (USA), LLC] prior to August, 2002." (Doc. # 201, p. 7). Obviously, Credit Suisse Securities (USA), LLC is not a party to the two agreements containing the jury trial waiver and thus it has no standing to enforce the waiver even if the Trust were bound by the commitment of two of the fifteen Debtors.

■■■ . It is fundamental that, "[g]enerally, a jury waiver provision in a contract or lease affects only the rights of the parties to that contract or lease," *Hulsey v. West*, 966 F.2d 579, 581 (10th Cir.1992) (guarantor of corporate loan was not bound by jury waiver in an agreement that he did

2. These are: Oakwood Homes Corporation, Oakwood Mobile Homes, Inc., Oakwood Acceptance Corporation, LLC, HBOS Manufacturing, LP, Suburban Home Sales, Inc., FSI Financial Services, Inc., Home Service Contract, Inc., Tri–State Insurance Agency, Inc., New Dimension Homes, Inc., Dreamstreet Company, LLC, Golden West Leasing, LLC, Crest Capital, LLC, Oakwood Shared Services, LLC, Preferred Housing Services, LP, and Oakwood MHD4, LLC.

not execute in his personal capacity). Thus, Defendants, including Credit Suisse Securities (USA), LLC, cannot all claim shelter in a waiver signed only by Credit Suisse First Boston, New York Branch. Nor can that waiver diminish the rights of thirteen Debtors that did not sign it— Even if one were to ignore the "New York Branch" rights that now belong to the Trust.

Even if one were to ignore the "New York Branch" identification, the result remains the same. If the two agreements are read to intend that the Credit Suisse entity is simply "Credit Suisse First Boston, a Swiss banking corporation," the caption of this case identifies "Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation)" as a Defendant, but Defendants acknowledge that the target of the jury trial counts is the Defendant "Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston, LLC)."

■■■ The second problem relates to the scope of the waiver itself. At its broadest, the waiver pertains only to an action "relating directly or indirectly to" the agreements establishing the Warehouse Facility. But the legal claims are not about any breach of those agreements, or about whether Credit Suisse First Boston, New York Branch adequately performed thereunder. Rather, it is about whether Defendants breached far broader duties, not arising from any written contract, by partaking a myriad of alleged illicit transactions with the Oakwood Companies.

Because this action is about much more than the Warehouse Facility and related agreements, it falls outside the scope of the purported waiver. Other courts have reached the same conclusion in similar circumstances. See, e.g., Nichols Motorcycle Supply Inc. v. Dunlop Tire Corp., 913 F.Supp. 1088, 1146–47 (N.D.Ill.1995) (broad jury waiver in "Distributor Agree-

ment" did not encompass any "claims that do not directly arise or have their basis in the Distributor Agreement"); Nat'l Acceptance Co. v. Myca Prods., Inc., 381 F.Supp. 269, 269–70 (W.D.Pa.1974) (jury waiver in loan agreement purporting to affect "any action" between the parties did not apply to claim alleging breach of a separate oral agreement); see also OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.), 340 B.R. 510, 519–20 (Bankr.D.Del.2006) (indemnification provision of August 19 Contract does not apply to actions for breach of independent, non-contractual duties). The purported contractual waiver is far too limited to apply here.

The final problem with Defendants' contractual waiver theory is that Defendants have not proffered any evidence to meet their burden of showing that there was no gross disparity in power between the two Oakwood Companies and Credit Suisse First Boston, New York Branch.

■■■ The Supreme Court and the Third Circuit all agree that "because the 'right of jury trial [in a civil case] is fundamental, courts [should] indulge every reasonable presumption against waiver.'" Tracinda Corp. v. DaimlerChrysler AG., 502 F.3d 212, 222 (3d Cir.2007) (quoting Aetna, Ins. Co. v. Kennedy ex rel. Bogash, 301 U.S. 389, 393, 57 S.Ct. 809, 81 L.Ed. 1177 (1937)); Collins v. Gov't of Virgin Islands, 366 F.2d 279, 284 (3d Cir. 1966). A valid, enforceable waiver clause must meet the knowing and voluntary standard, which requires that: (1) there was no gross disparity in bargaining power between the parties; (2) the parties are sophisticated business entities; (3) the parties had opportunity to negotiate the contract terms; and (4) the waiver provision was conspicuous. First Union Nat'l Bank v. United States, 164 F.Supp.2d 660, 663 (E.D.Pa., 2001); Tracinda Corp., 502

F.3d at 222. Given the presumption against waiver "the burden of proving that a waiver was done knowingly and intelligently falls upon the party seeking enforcement of a waiver ... clause." *First Union Nat'l Bank,* 164 F.Supp.2d at 663.

 In this case Defendants bear the burden of proving the waiver clause is enforceable. Looking at the factors, there is no question as to the sophistication and intelligence of the parties who entered into the agreements. Question arises, however, regarding the bargaining positions of the parties when they entered into the Note Purchase Agreement.

Plaintiff points to a video deposition by Mr. Douglas R. Muir, a officer of OHC. In the deposition Mr. Muir stated that finding a successor facility to its then credit providers, Bank of America, was critical and had to be done. (Doc. # 204, Decl. Holt, Ex. B, at 52:13–16). However, there was not "a half a dozen credit providers lined up at the door, each of which was offering to do [the] transaction. At the time [Defendants] w[ere] the only game in town." (Doc. # 204, Decl. Holt, Ex. B, at 51:13–16). Additionally, there was pressure from Bank of America to take it out of the facility, or it would have charged Oakwood Companies large fees. (Doc. # 204, Decl. Holt, Ex. B, at 52:6–12). Given the critical nature of the transaction, the lack of candidates, and the pressure from Bank of America, there is a good argument that the two Oakwood Companies were at a severely disadvantaged bargaining possession. Thus, they did not have any leverage to fairly negotiate the terms of the Note Purchase Agreement. Because Defendants did not offer any evidence to the contrary, Defendants failed to meet its burden of proof that the parties had equal bargaining position. Consequently, because this Court must construe the waiver narrowly and any ambiguity is to be decided against the waiver, the waiver is not enforceable here.

### Conclusion

For the reasons stated above, Plaintiff's motion for determination of Plaintiff's rights to a jury trial is granted. Plaintiff does have the right to a jury trial on three of its 10 counts.

### ORDER

For the reasons set forth in the Court's memorandum opinion of this date, the motion of OHC Liquidation Trust for determination of Plaintiff's rights to a jury trial (Doc. # 198) is granted to the extent that three of the 10 counts in the complaint are entitled to a jury trial.