**In re: OAKWOOD HOMES CORP., et al., Debtors**

**OHC Liquidation Trust, Appellant**

**v.**

**Credit Suisse (f/k/a Credit Suisse First Boston, A Swiss Banking Corporation); Credit Suisse Securities (USA) LLC (f/k/a Credit Suisse First Boston LLC); Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston Inc.); Credit Suisse (USA) Inc. (f/k/a Credit Suisse First Boston (USA) Inc.); John Does 1–100.**

No. 08-4445.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) Dec. 14, 2009.

Filed: Dec. 16, 2009.

---

Marla R. Eskin, Esq., Campbell & Levine, Wilmington, DE, for Debtor, Appellant.

Anthony Castanares, Esq., Kenneth L. Dorsney, Esq., Stephan M. Ray, Esq., Scott H. Yun, Esq., Stutman, Treister & Glatt, Los Angeles, CA, Kathleen C. Davis, Esq., Kenneth L. Dorsney, Esq., Kathryn S. Keller, Esq., Campbell & Levine, Wilmington, DE, for Appellant.

Mark D. Collins, Esq., Anne S. Gaza, Esq., Lee E. Kaufman, Esq., Russell C. Silberglied, Esq., Richards, Layton & Finger, Wilmington, DE, Katherine Z. MacHan, Esq., Mary K. Warren, Esq., Mary K. Warren, Esq., J. Justin Williamson, Esq., Linklaters, Michael J. Osnato, Jr., Esq., New York, NY, for Credit Suisse, Credit Suisse Securities USA, Credit Suisse Holdings, Inc., Credit Suisse USA.

Before: SLOVITER, JORDAN and WEIS, Circuit Judges.

## OPINION

SLOVITER, Circuit Judge.

This appeal challenges the District Court's grant of partial summary judgment based upon the New York *in pari delicto* doctrine. Because the parties have settled all remaining issues, the matter is ripe for appeal. For the reasons stated below, we will affirm.

### I.

Oakwood Homes Corporation ("Oakwood") produced and sold manufactured homes, the purchasers of which were often low-income individuals with poor credit. In the 1990s, Oakwood expanded its business to include mortgage financing. Oakwood retained Merrill Lynch to securitize the payment streams on the mortgage loans that it financed. Securitization is a process by which expected payment streams are pooled together and restructured into securities, which are then sold to investors. By securitizing the payment streams, Oakwood was able to obtain liquidity to fund its operations. In 1994, Oakwood retained Appellee Credit Suisse ("Credit Suisse") to perform future periodic securitizations. Oakwood accomplished the securitizations in the ordinary course of business with the tacit approval of its Board of Directors, which was comprised of legal and business professionals from real estate development companies, law

firms, and investment banks. By the late 1990s, Oakwood's annual revenue grew to nearly $1 billion.

Oakwood's business deteriorated in 1999 when the market for manufactured housing collapsed and purchasers began to default on their loans. Oakwood incurred costs in repossessing, refurbishing, and refinancing the homes. Meanwhile, investor demand for Oakwood's securities was waning, and Oakwood had a surplus of unsold home inventory at its sales centers and factories. Oakwood's Chief Financial Officer "emphasized [unfavorable] current market conditions ... and uncertainty with regard to [Oakwood] existing in the marketplace." App. at 774–75. Ratings agencies questioned Oakwood's creditworthiness and downgraded its credit rating. Oakwood announced operating losses in its SEC filings and in press releases.

Facing a liquidity shortage, Oakwood contacted Credit Suisse in late 1999 and proposed a stop-gap financing transaction that would provide Oakwood with immediate liquidity. In assessing the proposed transaction, James Xanthos of Credit Suisse prepared an internal memorandum (the "Xanthos Memo") that summarized Oakwood's credit risk. The Xanthos Memo discussed the deteriorating market conditions, mentioned the risk of bankruptcy, and recommended against the transaction. The Xanthos Memo was consistent with the market's unfavorable perception of Oakwood: its stock was trading at about a quarter of its book value. Oakwood was not given a copy of the Xanthos Memo, a fact it emphasizes in its brief. However, the proposed transaction discussed in the Xanthos Memo never materialized.

At the end of 2000, Credit Suisse was "the only game in town" that was willing to provide stop-gap financing for Oakwood. App. at 2141. Oakwood negotiated a financing package with Credit Suisse.

Douglas Muir, who had been an Oakwood officer with responsibility over Oakwood's securitization program, testified that the financing package "was in [Oakwood's] best interests," and that Oakwood's Board agreed. App. at 2141. The financing enabled Oakwood to maintain "business as usual," i.e., to continue its periodic securitizations. App. at 1557. As one of Oakwood's Board members described, "[t]he securitization program had been an integral part of [Oakwood's] operation for a long time.... [T]he [B]oard was fully aware of how the [securitization] program operated, how it was doing and at no time undertook to mandate the discontinuance of it." App. at 1391.

In 2001, Oakwood turned to Credit Suisse again to facilitate a short-term financing transaction. Oakwood "ultimately closed a transaction that was—that worked for everyone," according to Muir. App. at 2136. Later that year, Credit Suisse negotiated a different transaction to re-securitize and sell some of Oakwood's most subordinated securities at a fraction of their par value. "It was the unanimous consensus of [Oakwood's] Board that the transaction be completed." App. at 810. Oakwood tried to stem the rising tide of defaults by diverting loans into its existing loan assumption program, but the effort resulted in "significant adverse liquidity effects." App. at 891. Although Credit Suisse "on occasion" corresponded with Oakwood and its attorneys regarding various transactions and issues, Credit Suisse did not control Oakwood or tell it what to do. App. at 1535. Indeed, Oakwood did not formally engage Credit Suisse as its financial adviser until after the events at issue.

On November 15, 2002, Oakwood filed for bankruptcy under 11 U.S.C. §§ 101, *et seq.* It stated that it did so "based primarily upon the continued poor performance of loans originated, the extremely weak conditions in the manufactured housing industry and the deteriorating financial terms in the asset-backed securitization market," in addition to "the general economic recession." App. at 445–46. Oakwood moved for permission in the Bankruptcy Court to continue engaging in the securitizations and other financing transactions with Credit Suisse. In support thereof, Oakwood asserted that "[h]istorically, securitization transactions have provided the most effective and least expensive financing technique for satisfying [Oakwood's] tremendous liquidity needs." App. at 182. "In fact," Oakwood noted, "[Oakwood] historically made a material profit on its securitization transactions," and "[a]lthough that profit has been reduced or even eliminated, the securitization transactions ... still remain the least expensive method for financing [Oakwood's] operations." App. at 182. The court granted Oakwood's motion.

On November 13, 2004, Oakwood's successor-in-interest (a liquidation trust, which is the Appellant in this appeal) objected to proofs of claim filed by Credit Suisse in the Bankruptcy Court and asserted, *inter alia,* counterclaims of common law negligence, breach of fiduciary duty, and breach of implied contract.[1]

---

1. Although Oakwood's successor-in-interest brought the action underlying this appeal, we refer to the successor-in-interest as "Oakwood" for ease of reference. Doing so does not affect our analysis. *See Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.,* 267 F.3d 340, 357 (3d Cir.2001) (holding that as a matter of federal bankruptcy law, the debtor-in-possession succeeds to the claims and defenses of the debtor as they existed at the filing of the bankruptcy petition, including any *in pari delicto* defenses that may be asserted against it). We recognize that this is a minority view as it relates to the *in pari delicto* doctrine. *See Official Comm. of Unsecured Creditors of AHERF v. Pricewaterhouse-Coopers, LLP,* No. 07–1397, 2008 WL 3895559, at *5 (3d Cir. July 1, 2008) (noting,

Oakwood alleged, and continues to allege, that Credit Suisse knew the transactions it was structuring were "value-destroying" and "would eventually drive Oakwood into bankruptcy," and that Credit Suisse "never bothered to undertake further due diligence about the effects of those transactions, never conveyed its superior understanding of the transactions to Oakwood, and never behaved in accordance with the fiduciary position it had assumed by refusing to participate in further value destruction." Appellant's Br. at 6. Oakwood sought $50 million for the diminution in the value of its assets and $21 million in fees that it paid to Credit Suisse for the transactions. The Bankruptcy Court held that Oakwood was entitled to a jury trial on these claims, *see In re Oakwood Homes Corp.*, 378 B.R. 59, 73 (Bankr.D.Del.2007), and the bankruptcy reference was withdrawn so that the case could be heard in the District Court.

In the District Court, Credit Suisse filed a motion for partial summary judgment which the Court granted based on the *in pari delicto* doctrine. The bankruptcy claims were referred back to the Bankruptcy Court, where the parties reached a settlement. Oakwood brought this appeal challenging the District Court's grant of partial summary judgment on the common law claims.[2]

## II.

We review a district court's decision to grant summary judgment de novo, and we apply the same standard the district court should have applied in determining whether summary judgment was appropriate.

*State Auto Prop. & Cas. Ins. Co. v. Pro Design, P.C.*, 566 F.3d 86, 89 (3d Cir.2009) (citation omitted). Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). "In reviewing the District Court's grant of summary judgment, we view the facts in a light most favorable to the nonmoving party," in this case, Oakwood. *Busch v. Marple Newtown Sch. Dist.*, 567 F.3d 89, 95 n. 7 (3d Cir.2009) (citations omitted).

## III.

The doctrine of *in pari delicto* refers to "[t]he principle that a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." Black's Law Dictionary (8th ed.2004). It derives from the Latin, *in pari delicto potior est conditio defendentis:* "In case of equal or mutual fault ... the position of the [defending] party ... is the better one." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985) (quotation and citation omitted). The doctrine is recognized as a defense under New York common law.[3] *See Jackson v. Assoc. Dry Goods Corp.*, 13 N.Y.2d 112, 242 N.Y.S.2d 210, 192 N.E.2d 167, 170 (1963), *overruled on other grounds by D'Ambrosio v. City of N.Y.*, 55 N.Y.2d 454, 450 N.Y.S.2d 149, 435 N.E.2d 366, 369 (1982); *Abright v. Shapiro*, 214 A.D.2d 496, 626 N.Y.S.2d 73, 74 (App.Div.1995). Under

---

in a certification of question of law to the Pennsylvania Supreme Court, that *"Lafferty's* view of *in pari delicto* is a minority one")*. However, we are bound by our precedent.

**2.** The District Court had jurisdiction under 28 U.S.C. § 1334(b) and 157(d). We have jurisdiction under 28 U.S.C. § 1291.

**3.** The parties do not dispute the District Court's determination that New York law applies.

New York law, the *in pari delicto* doctrine "does not necessarily apply where there is a difference in the quality of the fault." *Iroquois Gas Corp. v. Int'l Ry. Co.*, 240 A.D. 432, 270 N.Y.S. 197, 198 (App.Div. 1934); *see also McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 757 (3d Cir. 1990) (noting that a court "may not forbid recovery [on grounds of *in pari delicto* ] on account of a plaintiff's activities in a separate setting") (citation omitted).

◼ Oakwood's negligence and implied contract claims do not survive summary judgment under New York's *in pari delicto* doctrine. During the relevant time period, Oakwood decided to use securitization transactions to bolster its liquidity as it had done successfully throughout the 1990s. The decision to do so came from Oakwood and its Board of sophisticated business and legal professionals, who recognized that the transactions were in Oakwood's best interest. The District Court aptly observed that Oakwood's allegations "are entirely based on [its] financing strategies and transactions, all of which were authorized and directed by Oakwood's Board and Management...." App. at 74. Even after declaring bankruptcy, Oakwood asked the Bankruptcy Court for permission to continue the transactions as "the most effective and least expensive financing technique for satisfying [Oakwood's] tremendous liquidity needs." App. at 182. That Credit Suisse provided Oakwood with the mechanism for carrying out this aspect of its business plan does not lessen Oakwood's culpability. As the District Court noted, Credit Suisse merely "assisted Oakwood's implementation of its 'flawed' business plan by structuring and executing these transactions, transactions which provided the liquidity necessary for Oak-

wood's continued operation, exactly what Oakwood employed Credit Suisse to do." App. at 65–66. To the extent the financing decisions were blameworthy, Oakwood was at least as culpable as Credit Suisse: Oakwood routinely approved the "value-destroying" transactions as an appropriate way to raise liquidity when the company was in financial turmoil. The *in pari delicto* doctrine bars the claims. *See, e.g., Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F.Supp.2d 275, 309 (S.D.N.Y.1998) (finding that *in pari delicto* bars claim by investment funds against broker-dealers under New York law where "[t]he Funds were active and voluntary participants in the securities purchases about which they now complain"); *Buechner v. Avery*, 38 A.D.3d 443, 836 N.Y.S.2d 1, 2–3 (App.Div. 2007) (finding that *in pari delicto* bars claim "based upon the cooperation of the management ... with defendant third parties in committing the alleged wrongs").

◼ Oakwood seeks to avoid the consequences of *in pari delicto* by arguing that Credit Suisse was an "insider." Appellant's Br. at 39. The *in pari delicto* doctrine generally does not apply when one party controls the other—the so-called "insider" exception [4]—because it would allow a defendant that controlled a plaintiff to avoid liability by blaming the plaintiff it controlled. *See, e.g., Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 133 (2d Cir.1993) (noting, under Texas law, that "where the parties do not stand on equal terms and one party controls the other, the *in pari delicto* doctrine does not apply"). New York courts have recognized the exception. *See, e.g., Buechner*, 836 N.Y.S.2d at 3; *see also Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 497

---

4. The exception derives from the fact that corporations act through their directors, officers, and controlling stockholders. *See generally Unencumbered Assets, Trust v. JP Morgan*

*Chase Bank (In re Nat'l Century Fin. Enter., Inc., Inv. Litig.)*, 617 F.Supp.2d 700, 712–13 (S.D.Ohio 2009) (collecting cases).

N.Y.S.2d 898, 488 N.E.2d 828, 829–30 (1985) (recognizing similar exception in the context of an agent who defrauds his principal). Credit Suisse was not an "insider" for purposes of *in pari delicto* because Oakwood retained total control over its decisions. The undisputed evidence above, and the deposition testimony recited at length by the District Court, demonstrate Oakwood's control over its decision-making process.

Oakwood's reliance on a bankruptcy definition of "insider" is misplaced. *See Schubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 395 (3d Cir.2009). In *Schubert*, we considered the meaning of "insider" under the Bankruptcy Code, 11 U.S.C. § 101(31)(B). *Id.* The Bankruptcy Code provides that a trustee can avoid the transfer of property interests from a debtor to an "insider." 11 U.S.C. § 547(b)(4)(B). We noted that when Congress defined "insider" in § 101(31), it used language to indicate "a category of creditors, sometimes called 'non-statutory insiders,' who fall within the definition but outside of any of the enumerated categories." *Schubert*, 554 F.3d at 395. We thus rejected the argument that only a "person in control" could be an insider, holding that "the question is whether there is a close relationship [between debtor and creditor] and ... anything other than closeness to suggest that any transactions were not conducted at arm's length." *Id.* at 396–97 (citations and quotations omitted). The reasoning in *Schubert* does not apply to the meaning of "insider" under New York's *in pari delicto* doctrine. The justification for the doctrine here is not based on the statutory provision or legislative history. Instead, the justification relates to the control that others exert over a corporation that does not act on its own.

## IV.

■ The *in pari delicto* doctrine does not apply to Oakwood's breach of fiduciary duty claim. With regard to this claim, the alleged wrongdoing is Credit Suisse's failure to provide its opinion about the transactions with Oakwood, and summary judgment was warranted because of a lack of proximate causation. According to a member of Oakwood's Board, the Board was "fully aware" of the securitizations and how they operated as an "integral part of [Oakwood's] operation," and the Board "at no time undertook to mandate the discontinuance of [the transactions]." App. at 2221. Credit Suisse did not divest Oakwood of its decision-making authority, and there is no testimony that Oakwood would have changed its business plan had Credit Suisse actually offered its advice. Moreover, Oakwood attributed its bankruptcy to "extremely weak [market] conditions"— not to any supposed "value-destroying" transactions. App. at 445. The undisputed facts undermine a proximate causal link between Credit Suisse's omissions and Oakwood's injury. *See LNC Invs., Inc. v. First Fid. Bank, N.A.*, 173 F.3d 454, 465 (2d Cir.1999) ("[W]here damages are sought for breach of fiduciary duty under New York law, the plaintiff must demonstrate that the defendant's conduct proximately caused injury in order to establish liability.") (citations omitted); *Northbay Const. Co. v. Bauco Const. Corp.*, 38 A.D.3d 737, 832 N.Y.S.2d 280, 281 (App. Div.2007) (noting same). A reasonable jury could not find in favor of Oakwood.

## V.

For the above-stated reasons, the judgment of the District Court will be affirmed.